# CASES

IN THE

# SUPREME JUDICIAL COURT

OF THE

# STATE OF MAINE.

Bethel Steam Mill Co. *vs.* John B. Brown & others.

57   9<br>87  533

A symbolical delivery of large quantities of logs, landed on a stream preparatory to driving, is sufficient.

And a survey of such logs by a person mutually agreed upon by the parties to the sale, and the putting thereon by the vendor the vendee's mark as they are thus landed, constitute a sufficient delivery even as against subsequent purchasers, although, by the terms of the contract of sale, the vendor is bound to deliver the logs at a specified place many miles below the landing.

Trover, for two hundred and thirty-three thousand feet of spruce logs. The taking was not denied, the main question raised being that of title.

From the deposition of James Hamlin, introduced by the plaintiffs, it appeared substantially that he took charge of Bethel Steam Mills in October, 1865, and continued their agent until April, 1868; that on November 2, 1865, as agent of the plaintiffs, he made a written contract with one David Meserve for the purchase of certain timber; that Meserve thereupon arranged with Standley & Evans to put in logs in fulfillment of the contract, on the Chickawalapy stream, a tributary of the Androscoggin; that Meserve applied to the witness for advances with which to pay Standley & Evans; that one Lunt, who was employed by the plaintiffs to scale, was to see that the logs were marked by Meserve; that Lunt was to go upon

the landing from time to time and attend to his duties, and enter his scale upon a log-book; witness understood the logs were to pass when scaled and marked, and made the advances upon that supposition, although no such conversation took place between the parties until about the time of settlement; that Lunt's survey show 605,350 feet spruce logs put into the Chickawalapy by Standley & Evans; that the logs not having been driven out of the Chickawalapy when Meserve first came to settle, witness refused to settle; that the next time Meserve came to settle he brought a letter [read] from Lunt, stating that the logs were all in the drive excepting about 100 M; that witness told Meserve that the logs left back were the plaintiffs', and if they came out the next spring, they probably would not be injured any, but if they lay there two or three years, they would injure a great deal, and probably be very nearly spoiled, and that there would have to be a large reduction made on the logs if they lay back two or three years; that witness then settled with Meserve for 505 M; that witness heard in August, 1866, that the defendants had bought the logs in question and sent a scaler to scale them, whereupon the witness notified the defendants that the logs were the plaintiffs', having their mark, and they would look to the defendants for the pay; that there is a custom on the Androscoggin River that logs landed, scaled, and marked with the purchaser's mark are considered the property of the purchaser.

The terms of the contract sufficiently appear in the opinion.

From the deposition of W. F. Standley, introduced by the plaintiffs, it appeared substantially, that in November, 1865, David Meserve showed the witness a ·written contract made with Hamlin, agent of the plaintiffs, to deliver logs to them; that Uriah Evans, with whom witness had.purchased timber land on the Chickawalapy, was present; that Meserve desired witness and Evans to turn logs in with him under the contract, and witness and Evans assented; that in pursuance of the agreement with Meserve, witness and Evans commenced lumbering, landed logs on the bank of the stream and on the ice, received the plaintiffs' mark from Meserve to put on the logs; that Evans hauled, and witness took charge of, cut up

and put the plaintiffs' mark on each log, understanding this to be done in pursuance of Meserve's contract with Hamlin; put in 605 M, which were surveyed by Isaac Lunt, he having come twice a week at the landing for that purpose; that witness and Evans settled with Meserve, between 10th and 20th June, claiming pay for the whole 605 M, but Meserve would not allow the claim, saying Hamlin would not pay him for the 100 M left; that the settlement embraced 505 M, at $6.24; that witness then sold his interest to Evans; that all the logs left back on the Chickawalapy had the plaintiffs' mark, and were included in Lunt's scale.

From the deposition of A. S. Perkins, introduced by the plaintiffs, it appeared substantially that he had lumbered twenty years on the Androscoggin River, and that the custom prevailed on that river and its tributaries to consider logs as belonging to the purchaser when they were landed, scaled, and his mark placed upon them.

From the deposition of David Meserve, introduced by the defendants, it appeared substantially that he made the contract mentioned, and under it delivered 2100 M in the Androscoggin River in season for the spring drive, at different places, and some from the Chickawalapy, purchased of Standley and Evans; presented the contract to Standley & Evans, and witness was to take all logs they could deliver in the Androscoggin River in season for the drive, and was to allow them the same witness was to receive, provided they would assist him in filling the contract; advanced them $400; all the logs landed were not scaled and run from the Chickawalapy that spring; settled with the plaintiffs in the spring or summer of 1866, through Hamlin, their agent; nothing was said about logs left back until the final settlement, when he objected because some of the logs were left; had Lunt's survey when the settlement took place; Hamlin would not settle until he had an estimate of the amount left in the Chickawalapy; Lunt estimated 100 M and settled with him, deducting that amount; Hamlin refused to take the amount left; pressed him to pay a little money to secure the logs left in the stream, and he refused, saying, if ever he had those

logs he expected to buy them, they might be worth more in the spring, or might be less; Hamlin never paid anything nor offered to pay anything, on account of the logs left, nor has any one in behalf of the plaintiffs; never claimed the back logs of Evans, nor received any delivery or possession of them, but requested him to take them and take care of them himself.

*Uriah Evans*, deposed,—cannot tell how many logs, scaled by Lunt, were left in the Chickawalapy, something over 200 M according to Nutter's scale made in July or August were left; there were 200 spruce logs that Lunt did not scale, and some 3000 feet of pine; 200 M scaled by Lunt were also afterward scaled by Nutting, the 200 M being the same lot which Lunt had previously estimated at 100 M; logs scaled by Nutter were never given by witness into the possession of Meserve or plaintiffs; they were sold by witness to the defendants, for $6 per M, and cost witness seventy-five cents per M to drive them to the defendants' boom.

It was admitted by the parties that the amount of logs left back in the Chickawalapy, and afterwards purchased by the defendants, was over 230 thousand feet.

The Court were to decide the case according to the legal rights of the parties.

*Davis & Drummond*, for the plaintiffs, cited *Weld* v. *Crane*, 98 Mass., 152.

*W. L. Putnam*, for the defendants. The manufacture of an article pursuant to the order of a customer does not transfer the title.

Property does not pass so long as anything remains to be done by the vendor, unless by a sufficient preponderance of evidence purchaser shows that the intention of the parties were otherwise; and not then as against third parties without delivery.

Delivery of a part, as for the whole, is a delivery of the whole. *Boynton* v. *Veazie*, 24 Maine, 286. But delivery of a part, while something remains to be done to the balance by the vendor, is not ordinarily delivery of the whole. *Mason* v. *Thompson*, 18 Pick., 305. *Ropes* v. *Lane*, 9 Allen, 509.

Usage cannot contravene the rules of law relative to the transfer of property. It cannot make that delivery, which by the principles of law is not delivery. *Reed* v. *Richardson*, 98 Mass., 218.

A usage to be binding must be proved to have been uniformly adopted and generally known by those engaged in the particular trade. Arnold on Insurance, 71, and cases cited in notes.

Hence, where parties equally experienced in the trade contradict each other as to the alleged existence of the usage, it is not to be presumed that the witnesses are falsifying, but that the alleged usage has not become sufficiently established and known to be valid.

Where a witness testifies generally to the existence of a usage, but is unable to state a particular instance of the observance of the usage, his evidence should be rejected. Per Lord Mansfield in *Syers* v. *Bridge*, Doug. Rep., 530.

Defendants are three degrees remote from plaintiffs and their claim, because

1st. There was, by the contract, no sale from Meserve to plaintiffs.

2d. There was none from Evans to Meserve.

3d. There was no delivery to plaintiffs which would prevent the sale to defendants.

The first two points involve the same question; as Evans' verbal contract with Meserve was substantially the same as Meserve's with the plaintiffs.

In *Haynes* v. *Hayward*, 41 Maine, 488, the contract was clear to the effect that the title to the logs vested at the landing, and that the driving was an independent contract.

In this case it is equally clear the written contract with plaintiffs was executory for a sale and delivery in the Androscoggin River, and not at the landing. The contract has no reference whatever to any logs not delivered in the Androscoggin.

The common rules cited above apply, in that until they reached the Androscoggin, the driving remained to be done by Evans.

Hamlin admits in substance that the logs left back were at the

vendor's risk; Meserve states it more strongly. It is clear that plaintiffs paid nothing upon them. The fact that property is at vendor's risk, is strong evidence the title has not passed.

Hamlin seems to have had the idea that advances would hold the title to the logs. The authorities are all the other way, unless in peculiar cases with reference to contracts for building vessels. But in this case the advances were not to be made until the logs were put in the main river,—showing conclusively that until that time they were not in any way to be bound to plaintiffs. The fact that advances were in truth made sooner, does not change the contract.

By this contract, plaintiffs were holden to receive only such logs as were boomed in the Androscoggin as soon as the ice was out of the river, from two millions to two millions and five hundred thousand. By it no provision whatever is made for the disposition of logs not boomed at that time. How, then, could they be in any way bound by the contract? And how could Hamlin refuse to pay for the logs remaining back,—logs no way referred to in the contract,—and yet claim them as his property?

From the character of the Chickawalapy—described by all as uncertain—it is clear neither Meserve nor Evans were in fault that they were not run out; how, then, could they be bound and obligated with reference to them, when without fault on their part the plaintiffs had been released?

Plaintiffs urge a usage. The usage, if proved, could not contradict a contract so distinct in its terms as this.

The instances which Perkins knew were different from this. They were like the case of *Haynes* v. *Hayward*, *ubi supra;* as is evident from the fact that if not driven out, he was not to reserve the whole price as Hamlin did, but only enough to cover the driving.

It is plain that the whole gist of this which is called custom, is nothing more or less than that lumber-men, for want ordinarily of better evidence of title, claim everything that bears their mark, and can in practice seldom be successfully resisted.

It would be a reasonable custom that logs when landed under an

executory contract at the place where they are to be delivered, should be deemed the property of purchaser when surveyed and marked; but it would not be a reasonable custom, which would pass title at a point distant from that of agreed delivery, and before by the contract any payment was to be made, or that would bind the vendor to sell, as in this case, after the purchaser was relieved from his obligation to buy.

As to the third point, there has been no delivery of these logs such as must be made as against third parties, and which would prevent defendants from purchasing.

There is not any evidence that those delivered in the Androscoggin were delivered as a part for the whole. They were delivered because they had arrived at the place of delivery fixed in the contract, and not for the purpose of symbolizing the rights of the parties as to other logs. This was the cheese case of *Mason* v. *Thompson, ubi supra.*

Neither were marking and surveying a delivery. Lunt was not plaintiffs' agent,—certainly not acting in that capacity; but was acting in an entirely independent character as a surveyor, selected as an indifferent person. Besides, the Chickawalapy was not the place of delivery; and many acts which might by indulgence be construed as meaning delivery, if done at the place of delivery, cannot be so construed when done elsewhere.

But it may be claimed that as a matter of convenience, the title to logs must be considered as passing when the logs are marked and surveyed; that where logs are to go into a common drive the survey at the place of landing is the only way of determining the quantity sold and bought. True; when the landing is the place of delivery! But not true in theory, nor was not true in fact in this case, when the landing and the place of delivery are distinct; as then, of course, the survey at the landing will not necessarily represent what are delivered.

The only injury plaintiffs have received is that, apparently Lunt's estimate of the logs left back in the river proves insufficient. If they have any remedy for that, it would seem to be against Evans

or Meserve for money paid by mistake.  Whether or not plaintiffs, in a suit of that sort, would be conclusively bound by Lunt's estimate of what remains back, as testified to by Standley, is not important to discuss in this suit, against parties who bought and paid for logs which had never been delivered, nor sold to any other party.

BARROWS, J.  The plaintiffs had a contract with one Meserve, for the purchase of from two million to two million five hundred thousand feet of spruce logs, which, according to the contract, Meserve was to deliver in the Androscoggin River, below Errol dam, as soon as the ice was out of the river in the spring of 1866. The logs were all to be distinctly marked with the plaintiffs' mark on each end, with an axe, and "to be scaled by Isaac Lunt, of Oldtown, and settled according to his survey."

By the same contract the plaintiffs agreed to pay Meserve "$6 per M feet, one-half as cash, May 1, the other half as cash, Nov. 1, 1866, and to make advances from time to time, as the logs are put into the river, as hereinbefore mentioned," interest to be reckoned on the advance payments so made, and four per cent additional on the fulfillment of the contract on Meserve's part, which last-named sum was declared to be in consideration of accepting payments on time for half the logs, and for putting in one-half the amount of the contract full length.

Meserve exhibited the contract to Standley & Evans, who had bought standing timber on the Chickawalapy,—a tributary of the Androscoggin,—and they agreed to become jointly interested in the contract with him, and to turn in their logs in fulfillment of the contract, at the same price that he was to receive, and get them into the Androscoggin in season to go on with the rest of the drive. They cut and landed at one place on the bank of the Chickawalapy, and on the ice in the stream, 605 M, according to the scale and survey furnished them by Lunt, the surveyor named in the contract, who came from time to time to the landing-place on the Chickawalapy, to survey them.  He was employed by the plaintiffs, and it was part of his duty to see that the plaintiffs' mark was put

upon the logs. The plaintiffs' mark was put upon each log there landed, as stipulated in the contract, and the plaintiffs made advance payments from time to time, as agreed upon. It so happened that 233 M feet of the logs so landed and marked, on the Chickawalapy, did not get out of that stream in the spring of 1866, in season to go into the drive.

In May of that year, when Meserve first went to settle with the plaintiffs' agent, the logs on the Chickawalapy had not been started out, and the plaintiffs' agent declined to settle "until the drive had taken in all the landings."

In June, 1866, Meserve came again to settle, bringing with him a letter from Lunt to the plaintiffs' agent, in which Lunt states that he had "got the logs all in the drive, except about 100 M on the Walipy."

Thereupon a settlement took place, in which all the logs, including the 605 M landed by Evans & Standley, on the Chickawalapy, and amounting to about two million two hundred thousand feet, are charged to the plaintiffs, with the contract price carried out—"less 100,000 left in Chickawalapy."

In August, 1866, Evans sold the 233 M, which were actually "left in the Chickawalapy," to the defendants, who were notified by the plaintiffs' agent, before they paid Evans for the logs, that the plaintiffs claimed them as their property, and should hold the defendants responsible. The defendants took them notwithstanding this notice; and hence this suit, which must turn upon the question whether the plaintiffs owned the logs which were "left in the Chickawalapy."

The position taken by the defendants is that the contract remained executory until delivery in the Androscoggin River, below Errol dam, the place named in the contract as the place of delivery and that the property in the logs did not pass from the vendors to the plaintiffs for want of a delivery.

To determine whether this property had passed to the plaintiffs, it is necessary to consider not merely the stipulations in the contract itself, but the subject-matter of it, and the attendant circum-

stances also : e. g. the situation of the merchandise contracted for, and the usual course of the trade in it, and the subsequent particular acts and dealings of the parties to the alleged sale in relation to it.

The question of transfer to and vesting of title in the purchaser, always involves a question of the intention of the contracting parties ; and it is to be ascertained whether their negotiations and acts are evincive of an intention on the part of the seller to relinquish all further claim or control as owner, and on the part of the buyer to assume such control with its consequent liabilities.

The question is one by no means free from difficulty where, as here, there are acts and stipulations of the parties looking each way.

In general, however, it may be well to premise, the law regulating the delivery of property upon a sale accommodates itself to the necessities of the business and the nature of the property, making a symbolical delivery sufficient, where nothing but a constructive possession can ordinarily be had, and by no means overlooking the possibility that the merchandise sold may remain in possession of the seller for certain specific purposes, among which are transportation and delivery at another place, where the property in it has actually passed from him, and vested in the purchaser, without affecting the validity of the sale. *Boynton* v. *Veazie*, 24 Maine, 286. *Terry* v. *Wheeler*, 25 N. Y. (11 Smith), 520. The fact that the logs had not arrived at the point in the river where, by the contract, Meserve had undertaken to deliver them, cannot of itself be deemed conclusive that the property in the logs had not passed to the plaintiffs. Doubtless it is evidence strongly tending to that conclusion, and unless counteracted by the evidence of the other acts and doings of the parties to the trade, and of the usual course of business among dealers in logs, would be fatal to the plaintiffs' claim.

It is strongly argued that the plaintiffs were not bound to receive any logs that were not boomed in the Androscoggin River below Errol dam, as soon as the ice was out of the river, in the spring of 1866, and that these logs, not being so situated, cannot be looked upon as going into the fulfillment of the contract.

Looking with not a little force to the same result is the fact, that though the whole 605 M of the logs in the Chickawalapy were charged to the plaintiffs in the statement of the account, on settlement, a deduction was made of the whole contract price for 100 M, supposed to be the quantity left back. These are the circumstances which make most strongly against the plaintiffs' title.

If we could accept as true, Meserve's testimony as to what transpired between himself and the plaintiffs' agent, at the time of the adjustment, we should be disposed to hold that the property in the logs in controversy was not intended to pass and did not pass.

But we cannot overlook the fact that Meserve and Evans both must have known, when Evans made the sale of the 233 M feet of logs to the defendants, that they had already received their pay for 133 M of them from the plaintiffs, and we think that the position in which they stand in this particular, tends strongly to discredit their statements as witnesses.

The testimony of the plaintiffs' agent (which we accept as more likely to be true than Meserve's version of this part of the transaction) is : "I told him the logs were ours; that if they came out the next spring, they probably would not be injured any, but if they lay there two or three years they would injure a great deal, and probably be very nearly spoiled; I told him there would have to be a large reduction made on the logs if they lay back two or three years."

Here is no disclaimer of title to the logs that were left back, or of liability to pay for them at the contract price ; but it is rather to be construed as a reminder to Meserve that damages would be claimed of him in offset, if there should be a long delay in the fulfillment of his stipulation to have them below Errol dam.

Let us now see what there is which goes to show that it was the intention of these parties that the property should pass, and that it did pass to the plaintiffs, before arriving at the point in the river where the vendor undertook to place it.

We have no doubt that Standley & Evans, by their arrangement with Meserve, and the consequent turning in of these logs to make

up the amount called for by the contract, stood in such a relation to the plaintiffs, that the property in these logs passed to the plaintiffs, if any of Meserve's logs, similarly situated, would have passed. Whether they became partners with Meserve or not (a point we deem it unnecessary to decide), it is clear that they gave him ample authority to dispose of these logs, according to the terms of his contract with the plaintiffs, an authority which could not be revoked, if in pursuance of it the title to the logs had already vested in the plaintiffs. An important stipulation, in its effect upon this question of when the property passed, is the one which declares that the logs are to be settled for according to Lunt's survey. That survey was made as the work of filling the contract progressed, from time to time, at the landings where the logs were delivered, with the knowledge of all parties, and it includes the logs in controversy. It was according to that survey that the plaintiffs were bound to pay. The logs were to be marked as the plaintiffs might direct, and the testimony is that each of the logs in controversy had the Bethel Steam Mill Company's mark placed upon it at the landing. We cannot believe that the parties thus contracting and proceeding, could have had any other intention or understanding than that the property should pass, and be considered as delivered when the marking and survey were completed; and it would seem that if the delivery below Errol dam, in the Androscoggin River, constituted a condition precedent in the contract, it was waived and delivery accepted at the landings, where the survey and marking took place, with the understanding that Meserve would still fulfill his agreement to run them down to the point designated, as a condition subsequent.

A symbolical delivery of property thus situated was sufficient. It was only a constructive possession that could be expected to be taken. Lunt, though mutually agreed upon as the surveyor, was in the employ of the plaintiffs, and it was made his business specially to see to it that all the landings were turned into the river. He was clearly the agent of the plaintiffs for this purpose, and the act constituted as perfect a delivery as the nature and situation of the

property would permit. We think that the survey and marking of the logs in controversy, when they were so placed as to be liable to be mixed with other logs bearing the plaintiffs' mark, must be held to be a sufficient delivery.

How otherwise could there be any security for the seller, or any possibility of ascertaining what he was entitled to receive ? How otherwise could effect be given to the stipulation for a settlement according to the survey ? The rough estimate by Lunt of "*about* 100 M left back," was plainly no part of the survey. It might serve for a basis upon which to regulate the advance payments, and in conformity with it notes were given in June, covering more than half the amount of the logs in controversy, while apparently the payment for the balance was left unadjusted, until it could be ascertained how much damage the plaintiffs might suffer and be entitled to recoup by the failure of Meserve to bring them into the spring drive.

In fine, when we look at the nature of the business, and the manner in which it must necessarily be conducted, we see no safety for parties engaged in it from perpetual controversies, in which it would be very nearly impossible to arrive at any satisfactory conclusion, if we do not hold that, in the absence of the clearest evidence to the contrary, the making of a survey which is to be conclusive on the parties, and the affixing of the purchaser's mark to all the logs, when they are once put afloat, so as to be liable to be mixed with others bearing the same mark, is to be deemed a sufficient delivery to vest the property in the purchaser.

We think this must be our conclusion, independent of the evidence of custom offered in the case,—a custom eminently reasonable and proper, if not indispensable in the carrying on of the business.

For reasons similar to those above suggested, it would seem, it was held in *Walden* v. *Murdock*, 23 Cal., 540, that a sale of cattle roaming over uninclosed plains with those of other owners, if made in good faith, is not invalid as against creditors of the vendor, for want of delivery, until the purchaser has had a reasonable time to separate and brand them ; and that branding the cattle by the pur-

chaser is a good delivery to him, though he allows them afterwards to remain in the same uninclosed range of pasture.

In the view which we take of this case, the fact that the logs were still in the possession of the vendors, for the purpose of being driven to a point lower down on the river than the place where the survey and marking took place, cannot avail the defendants.

If merchandise sold remains in the possession of the vendor for a specific purpose, as part of the consideration, the sale being otherwise complete, the possession of the vendor is to be considered the possession of the vendee, and the delivery as sufficient to pass the title even against subsequent purchasers. *Hotchkiss* v. *Hunt*, 49 Maine, 213.          *Judgment for plaintiffs, for $1759.23.*

APPLETON, C. J., CUTTING, WALTON, DICKERSON, and DANFORTH, JJ., concurred.