[Rolfe, et al. v. Huntsville Lumber Co.]

# Rolfe, *et al. v.* Huntsville Lumber Co.

## *Trover and Conversion.*

(Decided May 13, 1913.   Rehearing denied June 6, 1913.
62 South. 537. )

1. *Sales; Contract; Transfer of Title.*—The facts stated and examined and held not to show a vesting of title to the logs in plaintiff.

2. *Same; Delivery.*—Where a contract is made for the purchase of goods and nothing is said about payment or delivery, the property passes at once so as to cast upon the purchaser all future risk, if nothing further remains to be done to the goods, although he cannot take them away without paying the purchase price; but if anything remains to be done on the part of the seller as between him and the buyer, such as measurements or counting out of a common parcel, before the goods are to be delivered, the right of property does not vest in the buyer until that is done.

3. *Same; Intention.*—The question of the transfer and vesting of title always involves a question of the intention of the seller to relinquish all further claim or control as owner, and on the part of the buyer to assume such control with its consequent liability.

4. *Same; Distinquished.*—Every agreement for a subsequent delivery is essentially executory, and there is a broad distinction between a sale which transfers the ownership, and an agreement to sell and deliver at a day certain, giving but an action for breach.

5. *Trover and Conversion; Right of Action; Title.*—To sustain an action of trover, a plaintiff must have at the time of the alleged conversion a general or special property in the chattel, and the actual possession or the right to immediate possession.

6. *Pledges; Essentials.*—A pledge is a transfer of personal property, as a security for a debt or other obligation, a bailment of personal property by the debtor to his creditor to be kept until the debt is discharged; the essential elements being that the possession of the pledged property pass from the debtor to the creditor, that the legal title remain in the debtor and that the creditor have a lien for the payment ·of the debt due him by the debtor or some other person.

7. *Same; Advances; Liens.*—Under the facts in this case, it is held that the logs had been placed as a security for the money advanced and remained in the possession of the buyer as pledgee.

8. *Same; Demand; Sale.*—Under sections 3303 and 3304, Code 1907, in the absence of any fixed time, a pledgee has the right after demand and notice to sell the pledged property within a reasonable time after maturity of the debt for which the property was pledged.

[Rolfe, et al. v. Huntsville Lumber Co.]

9. *Same; Conversion; Remedies.*—By virtue of his possession and special title in the property, a pledgee can support trover against one who wrongfully disturbs that possession, or converts the property, whether it be the pledgor or some third party.

10. *Same.*—Possession and special title in property will support an action of detinue by the pledgee against anyone who wrongfully disturbs such possession or converts the property, whether it be the pledgor or some other party.

11. *Same; Damages.*—Where the pledgor had sold the property without the permission of the pledgee, the measure of the pledgee's damages in an action for conversion is the amount of the debt with interest if the value of the property exceeds the debt, but if the value of the property is less than the amount of the debt, then the value of the property with interest.

APPEAL from Morgan Circuit Court.

Heard before Hon. D. W. SPEAKE.

Trover and Conversion by the Huntsville Lumber Company against C. C. Rolfe and another.   Judgment for plaintiff and defendant appeals.   Affirmed.

WERT & LYNNE, for appellant.   The contract was purely executory and the legal title did not vest in the plaintiff.—*Browning v. Hamilton,* 42 Ala. 484; *Robinson v. Hirschfelder,* 59 Ala. 503.   It was nothing more than a conditional acceptance.—24 A. & E. Enc. of Law, 1091.   The plaintiffs waived the tort.—*Singer Mfg. Co. v. Greenleaf,* 100 Ala. 272; *N. C. & St. L. v. Walley,* 41 South. 134; 28 A. & E. Enc. of Law, 739.   The rule is well established in Alabama that the verdict of a jury should not be disturbed unless it is plainly and palpably against the evidence.—*Cobb v. Malone,* 92 Ala. 630; *White v. Blair,* 95 Ala. 147.   All the charges given for the plaintiff left the issue of fact to be determined by the jury as to plaintiff's title.—*Holman v. Ketcher,* 45 South. 206.

E. W. GODBEY, for appellee.   The title was vested in plaintiff under the contract.—35 Cyc. 213; *Bethel S. Mill Co. v. Brown,* 99 Am. Dec. 752; *Walden v. Mur-*

*dock,* 88 Am. Dec. 135.   Even if there had been no de-
livery, the title would have passed.—*Montgomery F. Co.
v. Hardaway,* 104 Ala. 100; *Darnell v. Griffin,* 46 Ala.
522.   No waiver is shown.—40 Cyc. 254, 263; 38 Cyc..
2032; 63 N. W. 7; *Boyles v. Knight,* 123 Ala. 289.   The
court properly granted plaintiff a new trial, for the de-
livery was sufficient under the facts (*A. P. I. S. W. Co.
v. German,* 126 Ala. 194), or as a pledge.—*Jewett v.
Warren,* 7 Am. Dec 74.

THOMAS, J.—The appellee, the Huntsville Lumber
Company, brought this suit against Clifton C. Rolfe and
Percy M. Rolfe, partners composing the firm of Rolfe
Bros., for damages for the conversion of certain logs and
certain money, which the complaint alleges was at the
time of the conversion the property of appellee.   The
complaint contains nine counts.   The first four counts
allege the wrongful conversion by the appellants of cer-
tain logs, the property of the appellee, and the last five
the wrongful conversion by the appellants of certain
money, the proceeds of certain logs or lumber, the prop-
erty of the appellee.   The case was tried upon the plea
of the general issue, and there was a jury and a verdict
for the defendants.   Thereupon the plaintiff (appellee
here) moved the court to set aside the verdict of the
jury, upon the ground, among others, that the verdict
of the jury was against the great weight of the evidence.
The court granted the motion and set aside the verdict
and the judgment pronounced thereon, and the defend-
ants (appellants here) appeal.

1.   It appears from the evidence that the appellee
is engaged in the sawmill business at Decatur, Ala.,
and that in the year 1906 it made two contracts with
appellants, whereby appellants bound themselves to de-
liver logs to appellee, and upon the faith of which con-

tracts the appellee made certain advances in money and other things of value to appellants. In one of the contracts the appellants contracted to deliver from Morgan county logs to appellee at its mill. Some logs were delivered under that contract, and their value was credited upon the account which appellants had contracted with appellee to which we have already referred. In the other contract, which bears date August 7, 1906, the appellee contracted to pay appellants "for poplar, white oak and red oak logs delivered on bank of West Flint creek, in good shape, not over two miles above Wallace's bridge, ten dollars ($10.00) per thousand feet Doyle-Scribner log measure," provided that 50 per cent. of all logs delivered were number one logs, and provided that not over 25 per cent. of all logs delivered were red oak logs, and provided, also, that there were sufficient floats put in to float the oak logs down to Decatur in rafts, logs to be scaled and settled for whenever appellants had as much as 50,000 feet unscaled on bank, logs to be delivered on bank as above specified during the year 1906. The appellants agreed to deliver as much as 150,000 feet of logs at the above price in accordance with the above terms and specifications. It was this latter contract and the dealings of appellants and appellee under that contract, which resulted in this litigation. We direct attention to the fact that under the terms of the above contract no logs were to be scaled or settled for until appellants had as much as 50,000 feet of logs on the bank of the above-named creek at the above-named place. Until 50,000 feet of logs were placed on said creek certainly, under the terms of the above contract, appellants had no right to demand payment of appellee for any logs placed on the bank of the creek, and under the terms of that contract the title to no logs placed there by appellants vested in appellee. Until

[Rolfe, et al. v. Huntsville Lumber Co.]

50,000 feet were placed there by appellants, all logs placed there were, under the terms of the contract placed there at appellants' risk. If, for instance, a fire had destroyed them, the loss would have been appellants.' If, by reason of freshets, they had been washed away, the loss would also have been appellants'.

At the time the above contract was made the logs above contracted to be delivered were probably standing as trees in Lawrence county, and it is evident that no title by virtue of the above contract alone passed to the appellee.    After the above contract was made, appellants appear to have begun to place, in accordance with the terms of the contract, logs at the above-mentioned place on West Flint creek.    About December 15, 1906, they had placed there 4 red oak logs, 23 white oak logs, and 42 poplar logs, aggregating 23,965 feet, and 4 ash logs, aggregating 539 feet.    These logs were on said December 15th measured or scaled by one Ward, an agent of appellee, and he placed on each log an encircled "W," which was the mark by which appellee distinguished its logs from other logs.    Appellants seem to have continued after December 15th to place logs at said place, for on January 29, 1907, appellee's agent, Ward, again went to said place and again scaled or measured other logs as follows:  6 white oak logs, 1,890 feet; 11 red oak logs, 4,011 feet; 17 ash logs, 3,813 feet; and 24 poplar logs 7,346 feet.    He at that time branded each log so measured or scaled with appellee's encircled "W," and according to the testimony of Ward the total value of the two lots of logs, including the ash logs, so measured or scaled was $415.    This witness testified that "there was no agreement made between me and the defendants, or either of them, either in December, 1906, or in January, 1907, at the time I scaled the logs, with reference to the purchase or sale of them.

Nothing was said with reference to the purchase or sale of them." The two lots of logs aggregated not 50,000 feet, but only a fraction over 40,000 feet, and we are not of the opinion that the mere scaling of the logs, their marking with the encircled "W," or the estimate which the witness Ward made of their value in any way, under all the evidence in this case, operated as a transfer of the title to the logs from the appellants to appellee. When the first scaling was made, it was anticipated by appellee's agent (Ward) that the appellants would, of course, comply with their contract, and place at least 50,000 feet of logs at the point at which the appellee was bound, under its contract, to accept them when they amounted to that many feet. When he made that scaling of the logs, and took down their numbers, naturally he placed the appellee's mark upon them, so that, when as many as 50,000 feet had been placed there and the time for delivery came, he would know that all the logs previously scaled were there. The witness Ward testified, it is true, that the appellee advanced $200 on these logs, but that fact, as shown by a letter which was written by appellee shortly thereafter, did not in any way divest the general title of the logs out of appellants, and vest it in appellee. After appellee had received notice of the scaling which was made by Ward on December 15, 1906, appellee wrote a letter to appellants which is dated December 17, 1906, in which a check for $150—a part of the alleged advance of $200—is mailed to appellants, and in which letter we find the following: "It hardly looks to us as though you are going to get 100 M feet on Flint where you agreed to put out 100 M feet and *sell us on the bank.* We hope you will get out the 100 M feet there as we *cannot afford to go there* for less than that. And *you* will have to deliver them unless you *do* get out *100 M*

*feet.* We hope by the time you have another scaling, your showing will be different." When the scaling was made in January, 1907, that scaling was made after the *time fixed by the contract made in August,* which required the delivery of at least 50,000 feet on Flint creek during the year 1906, *had expired,* and *after* the appellants had been notified, on December 17th, by the appellee that the appellants would *themselves* be required to deliver the logs at Decatur unless they placed as much as *100,000 feet on Flint creek.* When under its contract with appellants for the purchase of timber from Morgan county the appellants delivered logs at the mill to appellee, and those logs were scaled, the appellee and the appellants *knew* that the title to those logs vested in it, and it promptly credited appellants' account with the value of those logs. Appellants did not place as much as 50,000 feet of logs on Flint creek during the year 1906, and *never did* place 100,000 feet there at any time, and for that reason they *breached* their contract with appellee. As appellants failed to place as much as 50,000 feet on Flint creek during the year 1906, and never did, after that time, place as much as 100,000 feet there, the appellee was not, under the term of its original contract, or, if modified by the letter of December 17, 1906, under the terms of the modified, contract bound to accept the logs actually placed there; it *did not* credit appellee with anything for the logs *so placed there,* and we think it evident that at no time under the evidence in this case did the title to the logs which *were* placed *there* by appellants ever vest in the appellee. Suppose the logs referred to were still on Flint creek, worm-eaten and valueless. *Whose,* logs, under all the evidence and all the reasonable tendencies of the evidence, would they be? Upon *whom* would the loss thereby sustained have fallen—upon appellee or upon ap-

pellants? The questions formulate their own answer.

In *Joyce v. Adams,* 8 N. Y. 291, it is said that "it is a general rule of law that when a contract is made for the purchase of goods, and *nothing* is said about *payment or delivery,* the property passes immediately, so as to cast upon the purchaser *all future risk,* if nothing further remains to be done to the goods, although he cannot take them away without paying the price. But if *anything remains to be done* on the *part of the seller* as between *him* and the *buyer,* such as weighing, measuring, or counting out of a common parcel, before the goods purchased *are to be delivered,* until *that* is done, the right of property has not attached in the buyer." See, also, *John Martin v. Henry Hurlbut,* 9 Minn. 142 (Gil. 132).

"The question of transfer to and vesting of title in the purchaser always involves a question of the *intention of the contracting parties;* and it is to be ascertained whether their *negotiations and acts* are evincive of an intention on the part of the seller to relinquish all *further* claim or control *as owner,* and on the part of the buyer to *assume such control with its consequent liabilities.*"—*Bethel Steam Mill Co. v. Brown,* 57 Me. 9, 99 Am. Dec. 752.

It is possible that the facts in this case show that appellants were willing to relinquish all claim or control over the logs as their owners when the scalings by Ward took place, but *all* the evidence discloses that the appellee was not only *unwilling to,* but that it *did not, assume* control at any time of said logs *as owner* thereof with the *liabilities* of such owner. On the contrary, all the evidence shows that appellee looked to the appellants to *deliver* the logs as provided in the contract, and that *at no time* did it regard itself as liable to appellants for their value. All the acts of the parties con-

clusively show that at no time did the appellee regard the appellants' contract as fulfilled or that it was under any obligation to appellants to assume dominion over the logs or to accept the risks which possession of the logs would entail upon it.

"Every agreement for a subsequent delivery is essentially executory. * * * The distinction between a *sale* which *transfers the ownership* and an *agreement to sell* and deliver at a day certain, which gives but an action for the breach of it, is a broad one."—*Strong, Deemer & Co., Limited, v. Dinniny,* 175 Pa. 586, 34 Atl. 919.

It has ever been the rule in this state that to sustain an action of trover the plaintiff must have at the time of the alleged conversion a general or special property in the chattel *and either* the *actual* possession of the chattel *or* the right of immediate possession.—*Tallassee Falls Mfg. Co. v. Alexander City First Nat. Bank,* 159 Ala. 315, 49 South. 246.

[The foregoing portion of this opinion was prepared by Judge DE GRAFFENRIED, and was adopted by this court after he became a member of the Supreme Court.]

The appellee had, as pointed out and shown therein, no general property or title to the logs. The only remaining question then, is: Did it have such a special interest or title in or to them as would support this action? We are of opinion that it did. We think the facts, without conflict, are such as to show that the appellee had a lien upon the logs, to the extent of the money it had advanced the appellants upon them, secured by an implied pledge of the logs.

A pledge may be defined to be "a transfer of personal property as a security for a debt or other obligation" (31 Cyc. 785), or "a bailment of personal property by a debtor to his creditor, to be kept by him until his debt is discharged" (22 Am. & Eng. Ency. Law, 842). "The

three elements necessary to constitute a contract one of pledge are: (1) the possession of the pledged property must pass from the pledgor to the pledgee or to some one for him; (2) the legal title to the pledged property must remain in the pledgor; (3) the pledgee must have a lien on the property for the payment of a debt or performance of an obligation due him by the pledgor or some other person."—31 Cyc. 797. "The delivery of the possession of the property to the pledgee may be actual, constructive, or symbolical; but it must be clear, unequivocal, complete, and effective at all times so as to give notice to third parties of pledgee's rights." —31 Cyc. 801. As fulfilling this latter requirement, it has been held in this state that where an iron furnace company borrowed money and pledged as security a certain number of tons of pig iron, and under agreement between it and the creditor a particular spot of ground belonging to the company and located apart from its other iron yards was tendered to the creditor and accepted by him as a place for setting aside and keeping the pledged property, and the company, in pursuance of the promise made at the time of procuring the loan, placed the pig iron, so agreed to be pledged, on such spot of ground, marking on it with paint the initials of the creditor pledgee, this was such a delivery of possession as to give validity to the pledge and to act as notice to the public of the pledgee's interest in the property.—*Am. Pig Iron Co. v. German,* 126 Ala. 195, 28 South. 603, 85 Am. St. Rep. 21.

The present case in this particular is even stronger than that. Here the logs were placed by defendants on the banks of West Flint creek—the place of delivery fixed by the original contract—and they were there scaled by plaintiff's inspector and each given plaintiff's mark of an encircled "W." While it is true, as

hereinbefore pointed out, that this possession was not so accepted by the appellee as to make it a delivery of the property in compliance with or waiver of the terms of the original contract, or to constitute it a purchaser thereof under that contract, so as thereby to make its holding of the possession of the property a holding as a purchaser invested with the general title thereto, yet we are of opinion that the relationship between and the situation of the parties is such that each understood, what must be implied from their conduct, that the appellee was to hold that possession as security for the money it had advanced before and did subsequently advance to the appellants on this property. Before this possession was on December 15, 1906, delivered on the bank of Flint creek, where the logs were scaled and marked by appellee's inspector, Ward, appellee on August 25, 1906, advanced appellants $50 and two days after possession was so delivered, it, on December 17, 1906, also advanced them $150, writing to appellants the letter from which we have hereinbefore quoted, in which it said: "We have received the scaling that our Mr. Ward made of your logs on Saturday [December 15, 1906], and your request for us to make you check for $150.00. We inclose you check for $150.00. It hardly looks to us as though you are going to get 100 M feet on Flint [the place at which the logs were], where you agreed to put out 100 M feet and sell us on the bank. We hope you will get out the 100 M feet there as we cannot afford to go there for less than that. And you will have to deliver them [here)] unless you do get out 100 M feet. We hope by the time you have another scaling, your showing will be different." Clearly, the first $50 was advanced appellants in contemplation of a delivery of the logs, and this $150 was advanced after the delivery and on the faith thereof, and of appellee's

resulting possession; and it is to be implied that it as pledgee was to hold these logs, as security for the money then and previously advanced upon them, either until it was repaid that money, or until appellants complied with the contract and delivered either 100 M feet on Flint creek, or failing therein, delivered, or bore the expense of delivering, these particular logs, or any quantity measuring less than 100,000 feet, at appellee's mills —in either of which two latter named events appellee was to become the purchaser of the logs, and was to owe the appellants the balance of the purchase money at the rate of $10 per thousand feet, as fixed by the contract, from which, of course, it was then to deduct the money advanced. In other words, appellee held possession of these logs as bailee for appellants, pledged as security for the money it then and previously advanced, or might subsequently advance, and was to become the purchaser of them or any others subsequently delivered, only in the event appellants delivered there on Flint creek enough logs to amount in measurement to 100,000 feet, or bore the expense of delivering these particular logs, or any less quantity than 100,000 feet, at its mills. The scaling value of this lot of logs delivered on December 15, 1906, was $245, and the scaling value of the lot subsequently delivered on January 29, 1907, was $175. These, being the only two deliveries under this contract, amounted to less than 100,000 feet; hence appellee never became the purchaser of the property, nor invested with the general title thereto under the original contract of purchase, as modified, but it did become and was the bailee or pledgee of all these logs by virtue of an implied pledge arising out of the fact of the delivery by appellants and the advancement of money to them by appellee under the circumstances of this case. This contract of pledge is independent of, but incidental and subsequent

to, the contract of purchase—the delivery being suffi-
cient in execution of the former, but not of the latter.
One of the appellants, they being partners, swore: "I
signed the agreement offered in evidence, of date
August, 1906, to sell plaintiff [appellee] some timber,
and I had a subsequent agreement with the plaintiff
with reference to furnishing money on that timber."
Subsequent to this delivery of the logs to plaintiff (ap-
pellee), the whole course of conduct of defendants (ap-
pellants) shows that they understood that the appellee
had a lien upon or interest in these logs, and that ap-
pellee also so understood.   One of the defendants says:
"He [Mr. Ward, plaintiff's agent] told me to sell the
logs to the best advantage to any one that desired to
buy them.   This * * * was about the last of April, 1907.
* * * He told me unless we sold the logs the loss would
be very heavy on us. * * * I also had a conversation
with Mr. Webster, vice president of the plaintiff.   He
asked me why I didn't go and sell the logs, etc.   He told
me to do the best I could with them, otherwise the loss
would be too great for us. * * * He told me I could have
them sawed, and made me some prices on the lumber
in the event I got them sawed. * * * Plaintiff never
claimed until this suit was brought that it owned these
logs, nor did it ever claim that the title was in it, but
insisted that any loss to the logs would be ours and
that the title to the logs was in us."

Assuming all of this to be true, while it is inconsist-
ent with a general title in plaintiff as purchaser, it is
not inconsistent, but, on the contrary, entirely consist-
ent, with a special title in plaintiff as pledgee, held as
security for the money it had advanced.

Its interest was to this extent and this extent only,
and it itself, as pledgee, had the right upon the maturity
of its demand—a reasonable time from the making of

the loan, in the absence of any time fixed by agreement between the parties—to sell, upon demand and notice, the property, Code, §§ 3303, 3304. It might also authorize defendant to do so, or to saw the logs into lumber and sell it, but this in itself would not amount to a waiver of its right in the proceeds to the extent of the debt owed it. One of the defendants further says: "I disposed of none of the logs, nor of the lumber sawed from the logs, in question, until after I had obtained the consent of plaintiff." If defendants did not recognize that the plaintiff had an interest in the logs, why the necessity of gaining its consent to sell them?

The witness Bixby, a sawmill man, and the purchaser from defendants of some of the logs, testified: "Prior to my purchase of the logs, I had gone to Lawrence county and examined them. Mr. Rolfe (one of the defendants) told me that it was plaintiff that had had the logs branded, and I requested him to get a written release from plaintiff. He told me that the plaintiff wouldn't give a written release, but that plaintiff had told him to go ahead and sell them. I telephoned plaintiff, and it told me it would be all right to buy the logs, so I bought them." The plaintiff denies that it authorized a sale of the logs; but, even if it did authorize it, it would not defeat its right to recover under those counts of the complaint which are predicated upon a conversion by defendant of the proceeds of the sale, unless it was also its intention thereby to waive its right to the proceeds, though it would defeat its right to recover under those counts which are based upon a conversion by defendants of the logs themselves.

The pledgee, by virtue of his possession and special title in the property, can support trover or detinue against any one who wrongfully disturbs that possession, or converts the property, be he the pledgor or some

third party (*Noles v. Marable,* 50 Ala. 366) ; but when he sues the pledgor of the property for its conversion, or for a conversion of the proceeds of the sale, when the property has been sold by the pledgor with permission of the pledgee, the measure of damages is the amount of the debt with interest, where the value of the property exceeds the debt, and is the value of the property, with interest, where it is less than the amount of the debt.— 31 Cyc. 840.

We discover no error in the action of the trial court in setting aside the judgment in favor of the defendants and in awarding the plaintiff a new trial, and this judgment is affirmed.

Affirmed.